PETTIBONE, MULLIKEN & CO. v. PENNSYLVANIA STEEL CO.

(Circuit Court, E. D. Pennsylvania.   December 5, 1904.)

No. 23.

1. PATENTS—INFRINGEMENT—CHANGE OF FORM.
    Infringement is not avoided by a mere change of form or location of
    parts, if the same principle is used through the same mode of operation,
    to accomplish the same result, even though an additional beneficial re-
    sult is attained through the change.

2. SAME—PRIOR USE—EVIDENCE TO ESTABLISH.
    Under the rule that prior use to defeat a patent must be proved be-
    yond a reasonable doubt, the testimony of a single witness, who de-
    pends entirely on his memory for the date, and is not corroborated by
    any facts or circumstances shown, is not sufficient.

3. SAME—ANTICIPATION—FOREIGN PATENT.
    A foreign patent, to constitute an anticipation which will defeat a
    subsequent American patent granted to one who had no knowledge of the
    foreign invention, under Rev. St. § 4923 [U. S. Comp. St. 1901, p. 3396],
    must describe the invention in such full, clear, and exact terms as to
    enable any person skilled in the art to construct the device patented.

4. SAME—INFRINGEMENT—SWITCH-STANDS.
    The Strom patent, No. 498,196, for a railroad switch-stand, the essential
    feature of which is a construction and arrangement of the parts such as
    to break the force of the wheel thrust of cars when the switch is operated
    automatically, and prevent the breaking of the gearing, was not antici-
    pated, and discloses invention.   Also *held* infringed.

In Equity.   On final hearing.

Dyrenforth, Dyrenforth & Lee, for complainant.
Walter C. Pusey and Joshua Pusey, for respondent.

HOLLAND, District Judge.   This is a suit brought by the com-
plainant for infringement of letters patent No. 498,196, granted by
the United States, May 23, 1893, to Alex A. Strom, assignor to the
Strom Manufacturing Company of Chicago, who assigned the same
to the complainants on the 21st day of November, 1900, "together
with all rights of action and claims for damages and profits arising
out of or occasioned by infringement of said letters patent prior to
the twenty-first day of November, 1900."

The defense set up by the answer is:  (1) That, in view of the
well-known prior state of the art, complainants' device involves no
invention and is without patentable novelty;  (2) the patent is in-
valid by reason of anticipation by certain prior patents and by rea-
son of certain prior knowledge and use by others; and (3) nonin-
fringement.

Prior to the date of the complainants' patent in suit automatic
switch-stands were in use.   The one most extensively utilized was
known as the "Mansfield Switch-Stand," and manufactured more
or less extensively by both complainants and defendant.   Certain
defects, however, manifested themselves in the use of switch-stands
of this character; and while the specification of the patent in ques-

¶ 1. See Patents, vol. 38, Cent. Dig. §§ 372, 373.

tion does not name the Mansfield stand, yet it is practically conceded by both parties to this suit that the Mansfield type was referred to by the patentee in the second and third paragraphs of his specification in describing the defects to be obviated in his patent, which are as follows:

"My invention relates to an improvement in the class of switch-stands in which there is employed a vertical target-shaft having a crank-connection with the rod connecting the switch-stand with the switch and a gear-connection between the target-shaft and a horizontal rotary shaft carrying a weighted arm, the starting of which by a wheel-thrust against a switch-rail causes it to be thrown in a vertical plane through a half circle, thereby completing the throw of the switch, while it effects only a quarter turn of the crank.

"As switch-stands of the particular variety referred to have hitherto been constructed, the full force of any excessive wheel-thrust against the switch is transmitted through the connecting rod not only to the crank on the target-shaft, but also to the gear connection thereof with the weighed arm. Thus two disadvantages ensue: First, fracture of the crank under the force of such excessive thrusts renders useless the gearing of the stand, of which the crank forms an integral part; and, moreover and particularly, the full strain of such excessive wheel-thrust is exerted both against the crank and the gear, whereby teeth of the latter are broken or at least so worn as to impair the operation of the gearing by causing them to work with lost motion."

These automatic switch-stands were manufactured to be used in connection with what is known as a point or split switch, and while intended to be operated by hand, yet so arranged that they will work automatically, in cases of emergency, by force of the flange on the wheels of a train passing through the switch "trailing"; that is, from heel to point.

The Mansfield stand consists of a case and base inclosing the segment gear, a vertical target shaft, upon which a horizontal segment gear is rigidly fixed, and which meshes with a vertical gear fixed to a horizontal bar extending back and out of the case, to which is attached an arm weighted at the end. The stand is bolted firmly to the ties outside the track, the connecting rod is pivotally connected to the lateral extension upon the horizontal segment gear, designated "the crank lug on segment gear," and at the other end it is secured in the usual manner of connecting rods to the rails of the point or split switch that is to be operated. The switch is operated either by hand by an attendant or automatically. When by the former, he raises the weighted arm, and throws it over to the opposite side, in which operation it described a half circle of 180 deg. This turning of the weighted arm turns the arm shaft, and with it the vertical gear, through a half circle, and by reason of the relative radii of the vertical gear and horizontal gear it moves the latter through an arc of 90 deg. The segment gear being rigidly fixed to the target shaft, the latter, and with it the target shown toward its upper end, is correspondingly turned through an arc of 90 deg. Manifestly, therefore, the turning of the weighted arm in a half circle, which turns the segment gear through an arc of 90 deg., draws the connecting rod, attached to this segment gear, with it, and thus shifts the switch rail to which the connecting bar is secured. To reset the switch, it is only necessary to return the

weighted arm to its original position. Secondly, should the switch be set against a train passing through trailing, and no attendant to turn the switch, it is intended to be operated automatically by the foremost wheels of a locomotive or car passing through the switch. In this event, the flange of the wheel strikes the switch rail and thrusts it over against the stock rail with a force measured by the speed of the train. The blow struck by the wheel against the rail is transmitted by the connecting rod directly to the crank lug; the segment gear is turned by the thrust through an arc of 90 deg.; and the vertical beveled gear, and with it the arm shaft and weighted arm, is thrown over through an arc of 180 deg. The shock thus produced upon the parts is evidently very great, as it requires two seconds to move the weighted arm by hand through this arc of 180 deg., whereas, when operated automatically, it is thrust through the half circle in about one-eighth of a second, and this time is lessened in proportion to the increase of the velocity of the train passing. The initial effect of the impact of the flange of the wheel with the switch rail must be to overcome the inertia of the weighted arm, and it is to this, mainly, that the destructive shock to the various parts of the switch-stand is found to be due, frequently fracturing the crank, which rendered useless the gearing of the stand, and even breaking the gear teeth, and some times knocking the top of the stand off the lower parts, and frequently loosening the stand from its fastenings.

As has been said, these stands were intended to be operated by hand, but are arranged to work automatically only in cases of emergency, so that it is plain that they are automatically operated in cases where otherwise there would probably be an accident, and it is apparent that frequently trains would pass through them with very great rapidity.

This full description of the Mansfield stand is important to show the defects of the old style of stand, which the patentee claims to have obviated by the invention of his device.

The Strom device, instead of attaching the connecting rod to the segment gear, introduces a crank section in the target shaft at a point somewhat removed from the segment gear, for the purpose of avoiding the shock being communicated directly through the solid and unyielding segment gear in cases of automatic use of the switch, but, on the other hand, allowing the shock to be imparted to the crank section of the vertical target shaft, thereby obtaining a cushion effect or a springiness resulting from the torsional elasticity of the crank and that portion of the target shaft between the segment gear and the crank; and another benefit derived was the fact that, should the crank be broken, the segment gear would still be intact; in other words, a very inexpensive part of the switch-stand would be injured and easily repaired.

The patentee aptly expresses his object in the description as follows:

"My object is to provide a construction of switch-stand in the aforesaid class whereby both of the objections referred to shall be obviated; and this I do by providing the crank as a section in the vertical target shaft, and pro-

viding thereon, for co-operation with a beveled gear on the rotary horizontal shaft carrying the weighted arm, a gear or gear segment, secured on the target shaft so far above the crank section therein as to allow for a degree of springiness in the shaft below the gear thereon, which will tend to take up any excessive wheel-thrust transmitted to the crank from the switch through the connecting rod, and thus shield the gear from the effect thereof; * * * and though the thrust may be successfully excessive in its force to break the crank section, it will not injure the gear, and will only require repairing of the target shaft, which is a comparatively easy and inexpensive matter."

The patent in suit, or the Strom patent, places the crank below the segment gear, but inside the case, and immediately above the lower journal of the target shaft. The only change in this arrangement made by the alleged infringing switch-stand of the defendant is the placing of the crank lower down, to wit, below the lower journal of the target shaft and outside of the case of the switch-stand. It is claimed by the defendant that this enables him to entirely close the case of the stand and prevents clogging from sand or snow. This is no doubt an advantage, but it in no manner affects the question of infringement. What the complainants claim to have patented is the application of the crank to a target shaft in this automatic switch-stand in such a way as to break the force of the wheel thrust of cars when operating the switch automatically, and the defendant's device simply changes the location of the crank, but makes the application of the same principle in its use. This slight change in form and location of the crank is such a plain adaptation of the complainants' device that it is difficult to see how the defendant can escape the charge of infringement, if the complainants' invention accomplishes the new and useful result claimed for it. It is, however, disputed by the defendant that any new or useful result is accomplished, and that the crank was only applied to the defendant's switch-stand below and outside of the casing for the purpose of enabling them to entirely close the case to prevent its being clogged by sand or snow, and that practically there is no difference between the operation of the switch-stand of complainants' and defendant's construction on the one hand and the Mansfield switch-stand upon the other; in other words, that in neither the complainants' or defendant's device is there any springiness to cushion a wheel thrust resulting from torsional elasticity in the crank and target shaft, as claimed, and that the use of a crank on the target shaft is the use of a device well known to the art from time immemorial, applying no new principle in these switch-stands and bringing about no new result.

I cannot agree with this contention of defendant. It is true all the parts of this automatic switch-stand are old and well known in the art prior to the issuing of this patent, but I find from the evidence that the complainants' application of the crank to the target shaft does bring about the result claimed for it in its specification. The defects found in the Mansfield switch-stand are overcome by the new construction and a new result accomplished. The defendant cannot be permitted to deny its existence for the purpose of showing a lack of invention, and excuse itself from using it upon the ground that its use is for

another purpose. It is so well settled that a mere change of form or location of the parts is not without a patent if the same principle· be introduced through the same mode of operation and accomplishing the same result, even though an additional beneficial result is attained through the change, that it is only necessary to refer to Winans v. Denmead, 56 U. S. 330, 14 L. Ed. 717.

To sustain the allegation that the patent is invalid in view of the prior state of the art, one witness is called to show an alleged prior use of a crank section in connection with a target shaft of automatic switch-stands manufactured by the defendant company prior to 1890. The witness called for that purpose, Mr. George W. Parsons, superintendent of the defendant company, has been in entire charge of the business of manufacturing frogs, switches, and signal appliances since July 1, 1883, from which time to the present they have been manufacturing the Mansfield stand. He testified that they had made another pattern of stand, the same as defendant's alleged infringing stand, prior to 1890, and stated that while manufacturing the old form of Mansfield stand by the old company they had occasion several times to furnish stands with the crank below the case, in order that the stand could be placed so that the switch connecting rod could be covered or brought below the surface of station platforms, and that this was done by simply making the target shaft longer, with a crank on the lower end of the shaft beneath the case, leaving the segment gear and pinion in the same position as in the Mansfield stand. The aperture in the stand was generally left open, but upon one occasion it was closed; and further claims that at that time no importance was attached to placing the crank upon the target shaft; that later on the Lake Shore had experienced a great deal of trouble by stands becoming clogged with sand in the summer time and snow in the winter time, and that led the defendant company to get up another pattern of frame adopted for inclosing the gear, having a crank below the case on the proper level for attachment to the switch connecting rod. One of the companies for which the defendant made some of these switch-stands was the elevated railroad in Brooklyn, the corporate name of which at the time the witness could not recall, and he "thought" that there were others made for a party in Baltimore. The witness further stated:

"I have no record of the year, but am sure that it was before 1890. No mention of these modifications were recorded. They were considered incidental, and were not at the time adopted other than for special instances where their use was necessary. 'I therefore,' he said, 'have only my memory to rely upon in making this statement. I am enabled to state that it was before 1890 mostly by relation of dates. I remember that at the time we were also making interlocking switch and signal appliances. I also recall that we sold out that business to the Union Switch & Signal Company in 1887, and that the old company had their establishment at Steelton, and these stands were made there and nowhere else."

I am not convinced that this witness is certain as to his dates, as he fixes it by the fact that they were made at the same time they were making interlocking switch and signal appliances, and that that business was sold in 1887. Just how the making of interlocking switch and signal appliances should enable him to say at the same time they were making this new device or switch-stand does not appear, and I

do not see that the fact they were making these articles in their shop would fix upon his mind the exact date when the new pattern of switch was made, if made at all, as he depends entirely upon his memory for the fact that they were both made at the same time, and he is as apt to be mistaken as to that as he would be as to the date when they actually began to make this sort of device. At any rate, this defense when set up must be established beyond a reasonable doubt, and the testimony offered to sustain it does not measure up to that requirement. It is so easy for witnesses honestly to color testimony in their own behalf, when interested in a patent, when the testimony lies entirely in their own recollection, as in this case, that it should not be permitted to outweigh the presumption of validity attached to the patent, especially so where there are no corroborative facts offered in support of the oral evidence submitted, and when that oral evidence is somewhat vague and uncertain. The witness does not know the names of the corporations to which these switch-stands were furnished. They were not even noted in the books of their company, and not one bit of corroborating evidence submitted, and no corroborating circumstances shown to support his bare recollection. When we remember the infirmities of the mind in matters of memory, and the liability of witnesses to be mistaken in matters of dates, we are inclined to assign the time when they began the manufacture of the infringing stand to a date after its advantage had been discovered by the complainants.

In support of the proposition that the defense of prior use and knowledge must be clear, convincing, and beyond every reasonable doubt, it is only necessary to cite Merrimac Mattress Mfg. Co. v. Brown (C. C.) 122 Fed. 87; Young v. Wolf (C. C.) 120 Fed. 956; Emerson Electric Mfg. Co. v. Van Nort Bros. Electric Co. (C. C.) 116 Fed. 974; and Moen Mfg. Co. v. Beat 'Em All Barbed Wire Co., 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154.

The answer alleges the claims of complainants' patent are anticipated by four United States patents, two British patents, and two German patents. There has been, however, only one United States patent, viz., the Weir patent, No. 294,100, issued February 26, 1884, the Hawkshaw patent, issued in England in 1838, and the German patent, issued to Schmidt in 1887, insisted upon as anticipations.

It is not seriously contended that the Weir patent anticipates, as the strain of lifting the weighted lever is transmitted from the switch rod to the lever from the gears in the defendant's switch-stand, whereas, in the Weir stand, the switch rod is attached directly to the lever, and the gears have nothing whatever to do with lifting the weight, and from the drawings in evidence I cannot find that it would operate automatically.

The Hawkshaw device was not intended to operate automatically. It is shown on the drawings submitted to be applied to a stub switch, and in the specifications we find that:

"In order to move the switch and to bring the main feature of the improvement into operation, the railway attendant has to depress the lever into the horizontal position and hold it while the train is passing from the mainline upon the diversion, which will bring the parts into position. * * * Now when the train passes from the main line to the diversion, the instant the attendant releases his hold on the lever, this combination of mechanism,

that is the connection of the balance weight, the bevel wheels, and the eccentric, immediately bring the rail or switch into their former position, and thus always preserve the right direction of the line for the principle or through traffic."

It will thus be seen that is a similar operation to what is called the snap-back switch, and is different from the switch of the complainants, it being a complete throw switch. It is also evident that the arrangement of the parts in this mechanism was not intended and is not adopted for automatic use, such as the uses to which the complainants' stand has been successfully devoted, and the fact that it might be altered to do the work that the complainants' device performs does not make it available as an anticipation of the patent in suit.

Neither was the Schmidt German patent intended to perform the same function as the complainants' patent. It is constructed with a view of automatically keeping the main track open, except when a train is passing from the side track onto the main track, and in a train so passing the switch is operated by arms coming in contact with the cars as they pass, and by that means the switch is opened, and after the cars have been switched on the main track, in passing beyond the switch, they come in contact with another arm, which results in closing the switch and opening the main track. There is a crank used on the lower end of the target shaft in this particular switch, but, as has been shown by the evidence, not in combination with the same arrangement as the complainants' switch; and the testimony is that if a mechanic were to change by substituting for the target shaft of the Mansfield stand the target shaft and the crank of the Schmidt patent, and connecting the switch rod to the crank in the way shown in the Schmidt patent, it would not affect the purpose of the complainants' patent; but, if arranged as in the Strom patent, it would affect the operation claimed for the Strom patent, which was not theretofore known, and therefore accomplishing a new and useful result.

Strom was not aware of the existence of the Schmidt patent at the time his was issued. He is therefore only charged with constructive knowledge of the publication in Germany. But even if it be in fact similar to that of the complainants, it could not defeat his patent, because as to prior use the law limits the inquiry to this country. A prior use in a foreign country will not defeat the patent here, and, as the patent has not been "described in a printed publication" in a full and intelligible manner required by section 4923 of the Revised Statutes [U. S. Comp. St. 1901, p. 3396], it cannot be regarded as an anticipation.

The description as published is as follows:

"Patented in the German Empire, counting from October 25, 1887.

"With the present switch at the union of mine railway tracks it shall be possible to reliably set the switch by means of the mine cars.

"The switch-tie-rod, 'a' is connected with one arm 'b' of a bell-crank lever; the other arm of this bell-crank lever 'c' is connected to the levers 'f' and 'g' by means of the connecting rods 'd' and 'e.' The levers 'f' and 'g' carry the arms 'h' and 'i,' which, as can be seen from the drawings, are located in front and rear of the switch.

"The operation of the switch is as follows:

"Assuming the switch is closed (as shown in Fig. 1), and a car is moving on track 11 in the direction of the arrow, the arm 'i' will be moved by the

body of the car into the position shown by dotted lines, thereby opening the switch. As the arm 'i' is connected with arm 'h' by the connecting rods 'd' and 'e' it follows that the arm 'h' is also moved into the position shown by dotted lines. After the car has passed the switch, it comes into contact with the arm 'h' and closes the switch again, so that trains of cars may pass over the track 'l' without interference.

"It is obvious that light signals or electrical contact appliances for giving signals may be connected with this switch in well-known manner.

### Patent Claim.

"In switches, which transfer automatically cars from a side track on to the main track, and reinstate the main track, the combination of the two levers 'h' and 'i' contacting with the car body, and the split rails, with the rods and levers 'a,' 'b,' 'c,' 'd,' 'e,' 'f,' 'g.'"

We do not think that any one could construct the Schmidt device from this description.

In order to defeat a subsequent patent, it is necessary that the description of a prior publication must contain and exhibit a substantial representation of the patented improvement in such full, clear, and exact terms as to enable any person skilled in the art or science to which it appertains to make, construct, and practice the invention patented. It must be an account of a complete and operative invention, capable of being put into practical operation. Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Cohn v. Corset Company, 93 U. S. 366, 23 L. Ed. 907; Badische Anilin & Soda Fabrick v. Kalle et al. (C. C.) 94 Fed. 163; Bowers v. Bridge Company (C. C.) 91 Fed. 381; Powder Co. v. Parker, Fed. Cas. No. 625.

There was also a drawing submitted of what was known as the "Pet Stand." In this stand, however, the crank used is on the outside of he case for an entirely different purpose from that of the complainants' patent, and the fact that this stand was manufactured prior to the issuing of the patent in suit is not well supported. It depends entirely upon the recollection of one witness. In fact, in all these stands, as well as in other machinery, cranks have been used and shafts have been used, as well as all other parts found in the complainants' patent, but never before do we find them in the same relative position in such a combination as to effect the result accomplished by the complainants' patent. He was the first to so arrange these old and well-known pieces of machinery to bring the result required. The changes made were slight, and apparently of not very great importance in each particular piece, but when combined by Strom the very slight change made in each one of the parts where change is found resulted in effecting a result which is shown to have been unknown and not accomplished by any other before the patentee.

There are numerous cases supporting inventions of this kind. It is only necessary, in support of this patent as against those cited as anticipations, to refer to Brill v. Third Avenue Railroad Company (C. C.) 103 Fed. 289, where it is said:

"A patent for a mechanical combination is not anticipated by a drawing in a prior patent which incidentally shows a similar arrangement of parts, where such arrangement is not essential to the first invention, and was not designed, adapted, or used to perform the function which it performs in the second invention, and where the first patent contains no suggestion of the way in which the result sought is accomplished by the second inventor."

This proposition is also supported in the case of Clough v. Barker, 106 U. S. 166, 1 Sup. Ct. 188, 27 L. Ed. 134; Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658.

Let a decree be entered for the complainants.